Good afternoon and may it please the court, I have reserved five minutes for my rebuttal. I'd like to first turn my attention to the issue of the ineffective assistance of counsel in this case and then I'm willing to the issue of the biased juror. Addressing first the ineffective assistance of counsel, I think it's important to look at the arguments of counsel during the closing argument to see how unprepared counsel was to put on a mitigation case. First counsel told the jury that Mr. Lang had a normal childhood until the age of 10. It was demonstrably false. He said that dad beat mom while pregnant but there was no evidence submitted during the mitigation phase which covered a total of 33 pages to support that. He told the jury that dad threw Eddie's life into chaos and again there was no evidence or testimony in support of that. He argued to the jury that Eddie came back from his time with his father different and again no evidence presented. The mother didn't testify to that? Not that he was different. She had only testified that when he came back and then life started to get more difficult for them. Well, wouldn't an inference from that be that happened because of that? I mean, that might be a reasonable inference or conclusion based on that testimony. It may have been if that was the way that the counsel was using the argument but that's not how counsel was presenting it as a but for causation. But was instead presenting it as an established fact without having the evidence to in fact support that. Additionally, counsel argued to the jury that mom was in fact the only constant figure in Eddie's case and in Eddie's life. Again that assertion was not borne out by evidence, not proven by any of the evidence and in fact is now known to be demonstrably false and we'll never know what happened during that time with dad was the counsel's argument. And in fact we do know what happened during that time and had the counsel bothered to investigate this matter they also would have known. There's significant number of police reports that demonstrate that dad raped Eddie while he was there, held him hostage inside of the house and beat him. Well the jury knew that the father had been convicted or at least charged with child molesting, right? That came out through either the mother or the... Through the mother's testimony it was that the father had molested the oldest son, Mendez, not Eddie. And they charged with child molesting somebody else? Of Mendez, yes. Of the brother, not of Eddie. Yeah. Do you agree with this statement? It's really difficult for defense counsel in some of these cases to figure out where to stop at presenting mitigation. When the counsel's decisions are challenged typically the position seems to be that he should have admitted every single thing he could possibly admit. But, seeing it from a practical standpoint, there's some point at which the efforts to portray the defendant as an antisocial, helpless, hopeless human being become more an argument for some jurors who might think that reflects adversely on the value of his life. It may mean that they're more likely to impose the death sentence rather than list. So do you concede there's some line drawing that counsel has to do in order to avoid that extreme negative reaction to the defendant by the jury? And if counsel does their proper investigation and makes that strategic decision, the law says that that decision is almost unassailable. What we have in this case, however, is counsel didn't do that investigation. Their investigator, the mitigation investigator, was repeatedly telling them that they were not obtaining the records that they knew existed from both Baltimore Children's Services, the school districts in Baltimore, were not providing the services. Thirty days before the trial, they go to the trial judge and they say, we need a subpoena because we can't get these records. And the judge immediately signs the subpoena. What they didn't do was then say, judge, we need a continuance of our trial so that our people can be prepared. On the first day of voir dire, they get a fax from the psychiatric expert that they had retained saying, where are the records? I haven't seen any files. So did those records appear before the mitigation hearing started? No. They did not appear until after he had been sentenced to death. And they number in the thousands of pages. When the case went to post-conviction, the public defenders had those records and they got Do we know that the investigator or counsel did not see these records? Until after the proceedings. The investigator They didn't produce them until afterwards. The investigator did not receive them until after the death sentence. They may have talked to people wherever they came from, right? We don't know that. That we do not know. And there has been no evidentiary hearing in this case at any level as to what counsel did know or didn't know. What we know is that they didn't have those records. They never saw those records. They didn't even have them as in the Raishan Johnson case where they at least had the records and never looked at them, but they gave those records to the jury. In this case, counsel never even had them. So when counsel gets up and makes this argument about these examples of a bad childhood, the counsel doesn't know whether those are false statements, true statements, misrepresentations by anybody, has no evidence on which to base that. And so making a strategic decision to not put on this type of evidence is an unreasonable decision when you don't have the predicate facts to decide. I agree, Judge Gibbons. The lawyers knew this and decided our best tactic is to present with this type of claim that we have. We have a much different case. Telling evidence that the records would have shown, was it that he was bipolar or that he was very violent against other people and was violent in school or was there something else? The most important records are the early childhood history of Eddie Lang. The first ten years of his life where his father is raping him as a toddler, where he's being forced to watch his father stab and rape his mother, when he's in the house when his father tries to burn the house down, when his mother abandons him to the care of his older brother who then sexually assaults both Eddie and his sister by forcing them to perform oral sex on them. All of this happens. That's much more important than during his adolescence. That's when most of the people get kind of violent and get out and do things instead of before they're ten. As Dr. Stinson explains, it's that early childhood development impact that explains why when he starts to be 13 and 14 years old, he starts manifesting psychotic behavior. Here's a child who's at 13 years old and he's being prescribed lithium because he's being diagnosed as bipolar. And yet the jury was told in this case that up until the age of ten he had a normal childhood. By no stretch of any imagination was what Eddie Lang was raised in a normal childhood. Normal children aren't raped at the age of three by their father. They're not abandoned by their mother. They're not left with somebody who is forcing them to perform oral sex on them. They're not having cigarettes burned on their body. They're not suffering physical trauma in utero. So when he's born, the doctors report that there's meconium fluid in the birth canal and he's suffering fetal distress. This is not a normal childhood. The 33 pages, only 22 of which at the mitigation phase are direct evidence from the defense side. The remaining pages are cross-examination by the prosecutor. Those 22 pages give the jury no understanding of what Eddie Lang's life was, nor what was it that resulted in him at the age of 19 years old being thrown away by his mother, shipped off to the boondocks, Ohio, which is what his mother calls Canton, to fend for himself in a place he knows nobody, has no support system. This is a kid who's been, since the age of 13, every diagnosis he's received, every medical treatment he's been given has said, this kid needs intensive inpatient treatment. And his mom throws him out of the house, says, get out of the car and go to Canton. Why did she pick Canton? I have no idea, Judge. I have no idea, Canton. Eddie doesn't know anybody when he gets to Canton. I think there is some distant family connection. The brother had been in Canton for a while, but it wasn't that he didn't go to live with the brother. How they picked Canton from Baltimore, I have no idea. But that's what they did to him. Of course, the hurdle that you have to get is to show that the Ohio courts were unreasonable in their determination that this was ineffective assistance, right? Correct. And our position is that the decision of the Ohio, of the Court of Appeals that heard this evidence in post-conviction was an unreasonable determination of facts. They determined that this evidence was simply cumulative, and that counsel had made a strategic decision to simply play up and use mom to show that mom was a good mother. Well, first, counsel had no information in which to predicate that claim, and we also know based on the records that they didn't find that we now have, that that is absolutely false. Well, they obviously talked to the mother before they put her on. They talked to her for 25 minutes before they put her on the stand. But who all did the talking? Just the lawyers? The lawyers. The investigators? The lawyers. The mitigation investigator met with her. Where is the source of that evidence? That is in the mother's affidavit submitted in post-conviction, in which she explains her conversations with the lawyers, and it was 25 minutes just before they put her on the stand. And she had met with the investigator several weeks before the trial. She happened to be in town. The investigator was also in town, and the investigator asked her for help in obtaining the records. And that's it. That was her entire contact with the lawyers and the investigator in this case. The investigator never collected a psychosocial history from mother, never did a social workup on what was going on in the family. All of those things were there, and the investigator knew those were things that he needed to do. He was trying to get that. But because the record keepers were not providing the records, and I would point out that the Department of Children's Services in this case is the same Children's Services Department that failed to provide the records in the Wiggins case. They finally obtained a subpoena. They sent the subpoena and were told, well, we'll process it and we'll get you the information as soon as we get it processed. And after Mr. Lang was sentenced to death, the records were delivered. So the trial counsel didn't ask for a continuance. And is there any affidavit from the trial counsel as to what his strategy was, as to why he was doing what he was doing? No, there is not. No. Of course, that's the defendant's burden, is it not, or the petitioner's burden. And he didn't put it in the record at any time during the whole proceeding. That is true. And I don't know whether or not post-conviction counsel were rejected from that argument. We did seek to do that discovery in district court. We asked for leave to do depositions on the issue of ineffective assistance of counsel and specifically requested the ability to depose trial counsel to find out what their strategies were, and we were denied that opportunity. So it... Never did get... You could have gotten an affidavit, I suppose, or prior counsel could have. Prior counsel may have been able to. And again, I don't know whether prior counsel tried and the defense counsel refused to cooperate with them. We have no idea. But that would certainly be something that if we would go back on an evidentiary hearing and just develop the facts and find out, what did trial counsel do? What did trial counsel say? Why didn't they ask for a continuance? When you ask for the subpoena, the very next thing should be after the judge signs it, says, judge, then we're going to need time once we get these records to be able to figure out what they mean. They were given access to the forensic psychiatrist, Dr. Smaldon. Dr. Smaldon is constantly asking them, I need the records in order to do an evaluation, in order to do my job in this case, I need to have access to these materials. Where are they? So I'm curious about Dr. Smaldon, did he do a report? No. He did not. He had no foundation in which he could do a report. Did he interview Mr. Lange? Yes. He had interviewed Mr. Lange, but with the help of a lawyer. Without the records, there were other things that he needed to do that he simply couldn't do. But Dr. Smaldon had talked to counsel, did he not? Yes. Yes. He had talked. Talked to the investigator? Yes. Yes. So he could, in theory, do it orally, what was not in a report, right? Except there was no... Psychiatrist can say, this guy's, whatever he's... Well, except that without having the materials, you can't do anything of any value. You can say, I performed the psychological evaluations, but that's not the only thing the psychologist or psychiatrist does at the mitigation phase of the case. The idea behind both your mitigation investigator and then your psychiatrist who will testify is to explain to the jury what all of these materials mean, and what does it mean, and what is the impact on the development of a child to have these particular things happening to him? The problem was that Dr. Smaldon had nothing upon which to make a basis to do anything for mitigation, because none of those materials had been obtained. And so when he was asked, if he was asked by the trial lawyers, are you ready to testify? His answer would have to be, no, I have no foundation on which I can give any evidence or opinion to this jury. Is what you just said have an evidentiary basis in the record? As to that expressed comment, no. But we know that they had conversations, we know that he's asking them for the records so that he can prepare. You're surmising what Dr. Smaldon might have said. If that conversation even happened. I don't know if the lawyers even asked him, are you ready to testify? What we know is that they got funding from the court to get a mitigation investigator, they got funding to get the forensic psychiatrist, and then they didn't do anything to ensure that they could do their jobs. The mitigation investigator never compiled the records that were necessary for the forensic psychiatrist to do his evaluation and report and testimony to the jury. So when you have an expert who cannot testify because he doesn't have his materials, it's not a strategic decision to say we're not going to put on a mental health case. That's the epitome of what Strickland says, that it's not a strategic decision based on a reasonable investigation. And we know that the lawyers knew that this was material that they wanted because they were meeting, they asked the judge for the subpoena to get the records. They knew they needed them. They just didn't do anything to have them in time to use them at the proceedings. Was there some question that the trial court, the state trial court asked of the trial counsel for Lange about whether you had enough assistance to prepare your mitigation case? I don't remember the exact question, but I thought that the trial counsel had said yes, I'm adequately prepared. I don't recall that exact interchange. It would not be unlikely to have a judge ask his counsel ready to proceed and for counsel to say yes. What we know is they weren't. They weren't prepared. You have your psychiatrist the day that they're getting ready for the mitigation phase, writing in his notes that are in the record, just heard from mitigation investigator, records are coming. That's the day of the mitigation hearing. That lasted 33 pages. A court did order that those to be produced, did it? They did. And eventually the government agencies in Baltimore did reveal them, but not until after he was sentenced to death. Getting the subpoena was what counsel should have done, but then the next thing counsel should have done is ask for the continuance so that the records could be received, could be reviewed, and could be used. Did the subpoena have a date on which the records were supposed to be? No. It was just a subpoena for them to release these materials. And there was correspondence between the investigator and the department who said, well, we have to process them. We have to review them, redact as necessary, and we will provide them. But the court ordered that the records be produced before the mitigation trial part. Yes. That was 30 days before the trial even started. But counsel never asked for the continuance. And as this court recognized in Bigelow, that at the point that counsel gets information that needs to be investigated, the first thing the lawyer should do is ask for the continuance to do the investigation. And they never once asked for that continuance. And that's why we look at this, this is not some sort of strategic decision built on knowing what our case is, knowing what our facts are, this is going to be our mitigation strategy. This was a case built on the fact that they didn't know anything about what was happening. And so the only thing they had to put on at mitigation was mom and sister because they were in the courtroom. They didn't even know what mom had to say and whether or not what mom was telling them about a normal childhood was true, and we know now it wasn't. So to put on a mitigation case in the facts of this case, that is demonstrably false. We don't know what the mother told the lawyers during that period of time you said was very short. We do know. It was a 25-minute meeting. She needed to. Very possible, Judge, in which case then we should have a hearing and find out those things. But it's clear that they never took her on cross-examination, that what she said in her courtroom. So I assume without treating her as a hostile victim, except again if that's not true. And they didn't have any foundation in which to know whether what she was even telling them was true. So much so that in the rebuttal closing argument, the prosecutor stands up and says everything the defense counsel just told you is pure speculation. It's not substantiated by any of the evidence. There's been no testimony about this. And that was exactly true. But if the burden's on the petitioner, where does that leave us? That leaves us. It doesn't show what was told by the mother or what the lawyers knew or any of that stuff. But what we know is what they didn't know. What we know is that what mom testified about wasn't true. That this jury wasn't given the proper information about what is mitigating evidence. Unlike the Raishon Johnson case where at least the lawyers gave the jury the records. The lawyers never looked at the records. But they at least gave the records to the jury so that the jury could look through it. In that case the court said that's still not enough. Are you saying the mother perjured herself on the stand? I don't think mom necessarily perjured herself. I think mom told a story that isn't the true story of what life was like for Eddie Lange. A lot of people color it to make themselves look pretty good, I guess. And that's fine, but mom isn't the one facing the death sentence, Eddie is. And if that means that you have to point out that when mom says everything was peaches and cream during his childhood, you've got to point out that that's not true. You think a defense lawyer needs to show this mother is somebody pretty mean and ogre? You may have to. You may have to. And you may choose not to. I'm not disagreeing that you can make a strategic decision to try to portray somebody in a nicer light than they may be. But you've got to make that strategic decision. And you have to know what you're giving up. I'm curious why the state courts thought there was some strategy to make the mother seem nicer. I mean, how does that help Lange? That the state courts found that? I think, first off, I think that's an unreasonable determination of the facts when you look at the material that they had. I don't think there was a strategic decision to make mom look nice. So what could be the Ohio court's reason to say that that's a strategy? That's the way to dismiss an ineffective assistance of counsel claim. There is no strategy. There is no strategy. It would involve the mother saying the kid's life was fine until he went to go live with the parent, the dad. Not under the facts of this case. Not under the facts that we now know that trial counsel should have known. You could make that in another case. That may be a legitimate strategy, but that's what lawyers are supposed to do. Our job is to investigate, figure out how we're going to present the best case that we can, and present it. And I agree that that's not going to be subject to ineffective review or certainly not a grant under the amendment of 2254. But when you make a decision like that, not knowing anything about your client's history, and mom comes on and says everything was fine until dad took him, that's just not true. And to give affirmative falsehoods to the jury as a mitigation is not strategy. You ever seen a capital case in which defense counsel put a mother on and just tore up, and said you're just a prostitute, and you're just a mean mother, and this fellow would have been fine if he hadn't been raised by you? I've never seen that, have you? Alton Coleman. What's that? Alton Coleman. Yeah. Alton's mother threw him in the trash. Alton's mother left him there to die. He was only rescued because his grandmother found him crying in the trash bin. The defense counsel put that mother on? Put mom on trial. And this court, in one of Alton Coleman's cases, found that the lawyer's failure to do those other things in mitigation was ineffective assistance of counsel. So yes, sometimes we do have to attack the families of our clients. Sometimes we have to point out that they're not the nicest people in the world. And you would think that defense counsel should have put the father on too, unless he's dead. Was he dead then, or is he still alive? Nobody's seen that. Do you want to talk at all about the juror question? Well, I have 30 seconds remaining. So without that, if there's no further questions, I'll reserve for rebuttal. Thank you. Good afternoon. My name is Brenda Likla, and I represent the warden in this case. I'd like to start off by saying that I believe Mr. Benza may have mischaracterized a little bit the mother's testimony. The mother actually did testify that she was beaten while she was pregnant. There was a direct question by defense counsel to say, how was Eddie's dad while you were pregnant? She says he was violent. Also testified that Eddie was on antidepressants before the age of 10. Those are both in the record. She also testifies that, on both direct and on cross, about that being on the antidepressants before age 10. The prosecutor actually in cross-exam asks, so everything wasn't kind of peaches and cream before, you know, he went to dad's. And she admits that he was on antidepressants and had tantrums and, I think she called them fits. Does she say why he was on antidepressants? She does not say why. They don't ask her why. But that she had been, he had gone to specialists even before going to dad. Now, the visitation with dad was a court order. She had been preventing him from seeing dad up until age 10, until the court ordered her to send him to Delaware for a visitation. And that's when dad never returned him. And did she explain why she had not been sending Lange to see his father? Yes, your honor. That she had prevented dad from seeing him because of his violence and because he was abusive. And she testified to that on direct. So it was in the record that dad was an abusive figure even before age 10. Now, this characterization of Lange's childhood before age 10 being normal was a solitary statement by defense counsel in closing. So in his argument, which is not testimony, which is not evidence. It was a one comment that was made. The testimony from both sister and mom was that when Lange came back, he was happy initially when he first got back. And then everything kind of started to spiral. But both sister and mom had kind of conceded that he wasn't a perfect child before age 10. Why do you think that term was chosen? By defense counsel? Honestly, I think it was chosen because the state had said that word. So he's parroting it back to the state and saying, well, if this is normal, this is what the situation was. Yes, your honor. And I guess it is true that, I mean, clearly this individual's life was never normal. That's correct. Would concede that he did not have a typical, normal, healthy childhood. The testimony really begins at age 10 because that's where there's that break. He goes to see dad. He doesn't come back. He comes back, according to sister, they used to play together. They're only two years apart. He comes back at age 12, 13, and he's a completely different, doesn't want to play, doesn't want to do things. Of course, he's also a teenager, so he probably doesn't want to play with his older sister. But that's beside the point. He comes back different. But mom testifies that even before he goes, he suffers these fits. And the prosecutor asks her. What do you mean he suffers fits? Her testimony. Give me just a moment to turn to that page. The prosecutor asks, and it's in English. Now, you told us that even before Eddie went with his father, he was on medication for depression and anger, things like that. For depression, yes. And I think it was in, okay, here. It's on record page ID 8032. And it starts at line 19. I'm sorry, it starts a little before that. I want to ask you some questions about Eddie before he left, before he was taken from you at age 10. Can you describe what Eddie was like emotionally and mentally? Answer. Eddie was the type of child that, like all kids, he was a little, I think, question. Was he rambunctious? Answer. He had tantrums. He had tantrums, fits. He whined. He cried. He had his little outbursts. So Mom testifies to that before age 10. So the question, I mean, it's sort of like you and the defense counselor on different planets, almost, in terms of describing what's happening. Your Honor, we usually are. The concern that your opponent is raising is that the medical records, the psychosocial records, whatever kind of records Baltimore had or the places where Eddie was growing up, were not provided and were not available to the investigator and the Dr. Smaldon, who was supposed to write a report and then be a witness at mitigation. And so there was a fatal flaw in terms of what the defense counsel at trial was presenting as the case. How would you respond to that? Well, first of all, we don't know if Dr. Smaldon was supposed to write a report and testify. Psychologists don't always write reports and they don't always testify in these capital cases. They assist in preparing the attorneys for mitigation, but they do not always write reports and sometimes not writing reports is by design so the state doesn't have to get a copy of them. So we do know that Dr. Smaldon did examine records. In fact, looking at his billing statement, he spent over eight hours of consultation between Dr. Smaldon and the mitigation specialist. He met with counsel and the mitigation specialist for seven hours. He began review of case-related documents in January of 2007. My reading of this is that some Baltimore records were received earlier and perhaps the bulk of them, but Mr. Binza's argument sounded like there were no Baltimore documents until after trial. That's not correct, is it? No, Your Honor. My reading of the record is that there were some records, there were also some records that were conceitedly not obtained. It was a mixture, though. That's correct. Do we know what records were not received until after mitigation? I would assume it was the records that they put in at post-conviction, but I did not go and compare which documents were which. I'm sorry, Your Honor. I can do that in supplement if the court would like. How would you characterize the post-conviction Baltimore documents? Your Honor, based on the testimony of Mom, I would say, as the state court did, that it was cumulative to what was presented. He did not have a stellar childhood before age 10. Mom testified to the fact that Dad was abusive. The records indicate Dad was abusive. Mom testified that Dad had a history of being a child molester and that there was speculation that Eddie had been sexually molested, but that he'd never admit that. So that stuff was before the jury. The fact that these additional documents would have shown that, it was already in front of the jury, and that's what the difference is. It's not a complete lack of having this information. The jury had it. And, in fact, this jury strategy apparently partially worked. He only had one death sentence for two. Yes, the counsel strategy apparently worked. He received a life sentence for the murder of the one victim. We don't know what was in the mind of defense counsel about it. There's no testimony from the defense counsel or affidavits or anything. There is no testimony or affidavits, Your Honor. However, the defense counsel, at the beginning of the mitigation phase and, again, at the end of the mitigation phase, put out what his strategy was. And his strategy was he wanted to humanize Eddie, to make the jury understand he was a person, not just a case name and a number. He specifically uses the word humanize. He said that to the jury. He did, Your Honor, in both opening and closing of his mitigation. Well, his counsel now says he spent too little time in his closing argument. Is that a factor in there, or where did we put that in? Too little time on argument? Yeah, whatever it was, seven pages or seven minutes or something. Well, Your Honor, I don't put much stock in how long an attorney stands up there and talks to a jury. I was a trial prosecutor for eight years, and sometimes reading the jury, you could tell that they just wanted you to shut up so that they could go and get their job done. So without being the attorney in front of that jury to know whether you should keep going or just say your piece and be done, anything else would be speculation. And it's for the trial attorneys who are up there in front of the jury, much like being in front of a panel. Sometimes you can tell when you just ought to sit down and shut up. Well, there were a number of really negative events that happened in Eddie's life. And one concern that your opponent is raising is which ones of those were presented or not. So, for instance, just to take one example, the fact of the older brother raping him before he went to live with his father, was that introduced by the defense counsel? It was not, Your Honor. However, the fact that Eddie may have possibly been sexually molested was. Through the mother saying she thought maybe the father had done that to Eddie, but she didn't know because Eddie wouldn't admit it? Yes. And if Eddie wouldn't admit that father had done it, he certainly probably would not have admitted that brother had done it. So would there be records of that? I don't know, because when mom testified, she said that when the older brother admitted that Eddie Sr. had molested him, he was age 22 when he made the admission, and no police report was filed at that point. So the child molestation that Eddie Sr. went to prison for was not of the older brother. It was of a different child. Was that in some of these psychiatric records that weren't produced, or is that just something that was admitted later after the conviction? Mom testified. She testified, ma'am? She testified. They asked questions about the older brother, and the older brother had admitted to her when he was 22. And even on, I believe it was on cross-exam, the prosecutor asked, did he make a police report? And he said, no, he was 22 years old and didn't want to look like, I think she said, like a weakling or something. So he did not make a complaint. So if Eddie Sr. had gone to prison for child molestation, it was not for that child. And was it for another child of his or someone else? It was somebody, we don't know who, but it clearly wasn't the older brother and it clearly wasn't Eddie. So it was by process of elimination, somebody else, whether it was in the family or out of the family. That was just curiosity. Honestly, I don't know. Do you know what the records that eventually were produced by the Baltimore government side said? I believe that they were detailing specific instances of abuse prior to the age of 10. So have you looked at those records? I did, Your Honor. I obviously could not recite them verbatim. They were in the state court record, which has been made part of the federal record through the post-conviction. So those are all in the state court appendix that the warden would have filed with the return of writ. If you want, I actually do have that entire appendix with me and can get you page numbers if you want. In terms of some of these cases, different lawyers appear at different times, and when one makes a representation as to what the records say, I'm just curious whether you have personally reviewed all of the records. When I first wrote the brief, Your Honor, I did. I concede I did not go back and re-read all of the post-conviction records last night before argument. But there are records, and in fact, some of the records would have actually hurt Mr. Lang if they had been presented to the court. As Dr. Stinson in post-conviction indicated, some of the records indicate that he struggled to accept consequences for his behavior, to take responsibility for his actions. Lang struggled with frustration tolerance, impulse control problems, and had become aggressive and violent with his peers. That's Dr. Stinson's affidavit at record 18-4, page ID 2495. So that is something that was developed in post-conviction? Yes, Your Honor. And we don't know what Dr. Smaldon figured out before the mitigation hearing. What do you mean? We don't know what Dr. Smaldon's conclusions were before the mitigation hearing, because that wasn't in the record. Right. And I've seen this quite frequently, that the mitigation specialists do not do reports. They sit there and they consult with counsel. So they don't always, the psychologists do not always do reports at the trial phase. And a lot of the times it's to prevent the state from having to get those documents, because it was before kind of open reciprocal discovery back then. Do we know what Dr. Smaldon said to defense counsel or to the mitigation specialist or to anybody? I do not, Your Honor. That's not in the record? Not that I recall. We do know that mitigation specialist Jim Kratz was in the courtroom during mitigation. In fact, the trial court put on the record that the court had afforded funds for mitigation specialists and a psychologist and that one individual was in the courtroom and that counsel during the mitigation testimony was consulting Mr. Kratz. And defense counsel did admit that Mr. Kratz was in the courtroom and was being consulted during the argument. And you said Dr. Smaldon spent how long with the petitioner? Did you say something like seven or eight hours? He interviewed the defendant on two different occasions, on January 23rd and June 5th. He had over eight hours of consultations with the mitigation specialist. I don't have the exact hours of how many hours he spent with the defendant. He also met with both the sister and with the mom prior to testimony. In fact, his records indicate that he met with the sister once and with mom twice prior to the testimony. And that billing statement that I'm referring to can be found at the record 17-5, page ID 1604, is those billing records of Dr. Smaldon. So Dr. Smaldon did do document review. He began looking at case documents back in January. What case documents were there in January? I would presume in January would have been the discovery packets, all of the case information provided by the state at that early stage. Because that's shortly after he's been appointed. What I'm trying to figure out is when would it be logical for Dr. Smaldon to be able to make any conclusions about the life experiences and psychological state of Mr. Lange? Well, Your Honor, he also reviewed additional records on June 27th for a total of five hours of document review. That material, because it's, I believe, close to when the mitigation was, that that would have been mitigation documents. That would have been what documents it was. When was the subpoena issued compared to the June 27th date? That I do not recall the date of that subpoena. I can get that for you if you would like. I do not recall the date of that. Are you defending this upon the performance of counsel or the lack of prejudice or both? Your Honor, I don't believe that the defendant has met either prong of Strickland, either the deficient performance or the prejudice. Not only that, I don't believe he overcomes the doubly deferential standard of the AEDPA. So he has not just the Strickland hurdle to overcome, he also has the reasonability problem to overcome. Well, how would you compare this case to Wiggins? Your Honor, I believe that this is different than Wiggins, because in this case they did talk to the mitigation specialist, they did have testimony. And really the mitigation documents that he's claiming should have been put in, not only would they have been double-edged sword, but they also are cumulative to what testimony that was put in front of the jury. And as Judge Gibbons stated, there is a time when you have to, as defense counsel, choose your strategy. And their strategy was to humanize Eddie, because they had enough information to know that these documents could be a double-edged sword. He had spent time in psychiatric facilities. They had testimony about that. In fact, he had been, Maude testified, he had been in and out of psychiatric facilities 28 times. So clearly they were aware that there were these records out there. I would presume if they didn't have the records, somebody had talked to them. But if you heard from a mother that the child had been in and out of mental facilities 28 times, you would think this is a very mentally ill person who should be maybe even raising an insanity defense, or saying he's not competent, or at least instead of humanizing him as a normal person, humanizing him as a very sick, mentally ill person. That, again, is a double-edged sword to some juries. This was essentially a drug deal gone bad, and to kind of characterize him as a mentally ill, unstable individual, very well could have landed him with two death sentences rather than one. And clearly the strategy that the defense counsel had chosen was at least partially effective because he only received one death sentence. Couldn't a very logical reason for only one death sentence be that the jury thought that Ms. Cheek was an innocent bystander to the deal, whereas the other individual, whose name I can't really pronounce. Burdite, I think. Okay, thank you. That he was a drug dealer, and therefore a life sentence for the perpetrator was enough when you're killing a drug dealer. I mean, there are many explanations. There are many explanations. However, if they're following their charge, which is what they should be doing, they have to weigh the aggravating circumstances with the mitigating factors and have to find beyond a reasonable doubt that the aggravating circumstances overcome the mitigating factors. And they did do that finding for Ms. Cheek. They did not make that finding for Mr. Burdite. So you have to take them at that they follow their charge. Well, you just can't second guess what a jury does. Sometimes they have inconsistent verdicts. Exactly, Your Honor. Courts say that's all right. You can't do anything about it. Exactly, Your Honor. And that does happen all the time. The jury nullification does happen. So maybe we shouldn't make a conclusion as to why the jury decided to give only a life sentence for the one. I think it's a logical inference based on if we are assuming that the juries follow what they're told to do and follow the rules, which I believe is the presumption, that we have to make that presumption that juries follow the orders of the court. So I believe that that would be a valid presumption that their strategy was effective. They had enough information to make that choice to put mom and sister on. The mitigation specialist who would have most direct knowledge of what the records are is in the courtroom advising the attorneys on what questions to ask. But that assumes that the records were all available at that time, right? That enough of the records. Not all of the records. There's nothing anywhere that says all of the records must be obtained. There will always be more records to obtain. Defense counsel in postconviction and habeas, they always come up with more records that should have been obtained. Were all these records from Maryland or were there some records from Ohio? I believe they're all Maryland and Delaware. All Maryland. And Delaware. I think there may have been some from Delaware because that's where he was at for two years. When did he move back to Ohio? He moved to Ohio shortly before, I believe, the murder. He never was there to start with. I don't believe there was any Ohio records to be had. He grew up in Maryland. He was in Delaware for the two years that he was abducted by his father and then returned to Maryland and then somehow, and I'm not clear as to how he ended up in Canton, Ohio, doing drug deals. I don't know. That's not a fact in the record. No, Your Honor. It's not, or at least not one that I can recall. So I think the characterization of the record that none of this was before the jury is absolutely wrong. The jury did know that prior to age 10 that he had had some bad things happen. Did they know the extent of the bad things? No, they didn't. But they knew that he was not, you know. Did they know that he had been hit in the head with a baseball bat? That specific? No, but they did know that he had been abused and that mom kept dad away because of the abuse and that basically mom had basically had to pimp herself out to pay the rent to dad, resulting in her pregnancy with Eddie. So that, you know, after she became pregnant, he became violent. She testified to that very early on in her testimony, that that was the reason she did not allow Eddie to go to Delaware to visit dad until she was court ordered to do so. Why did the court order her to send him there? Honestly, Your Honor, I don't. That's not in the evidence. That's not in the record. I'm only asking for record evidence. Your Honor, I don't know. That would have been with the domestic court or juvenile court. But it wasn't presented. No, no, it was not. She did testify that when asked why did he have to go, apparently she had asked for child support and he had exercised his right that, well, if I'm going to pay you child support, I want visitation, and the court agreed. So she testified she fought that and lost. So what the court's reasoning behind that, I don't know that answer. That is not in the record. But she did testify that she prevented him from going up until she was court ordered to do so because of his violence. And when asked directly, why didn't you let Eddie see dad, it was because dad was violent. My understanding of one fact in the record was that the mom essentially made Eddie and I believe it was his sister essentially live alone, that she abandoned them to live alone. Was that introduced at trial, at mitigation? No, Your Honor, that was not. Sister had testified that her and Eddie were close up until age 10, did not testify that they basically were living alone. And the sister was, I think you said, two years older than? Yes, Your Honor. So I believe that she was asked how old she was. She was 21 when Mr. Lang was 19 at the time of the offense. So she testified that they were close up until he left. When he came back, they were no longer close, that Eddie had problems, had gone to psychiatric facilities and the like. Before or after the? Sister testified after. Mom testified to both before and after that, before he had been placed on medication because of these tantrums and fits, as she called them, and for depression. And she testified that that was before he left. So unless there are any other questions, believe that the district court opinion should be affirmed and that the findings of the Ohio courts were reasonable in light of the facts and reasonable interpretation. They were not contrary to or an unreasonable interpretation of Strickland or application of Strickland and was reasonable application of the facts. Unless there are any other questions. Thank you. Thank you. The Attorney General's position is that if counsel happens to blindly, luckily get a witness to say something mitigating, they've fulfilled their duty under the Sixth Amendment. And that's simply not true. Counsel's obligation is to investigate, prepare, and present the case for their client. Simply having mom say on one occasion he was on medication for depression doesn't tell the jury what was really going on. Telling him that he suffered from fits doesn't reveal that there are multiple police reports and Baltimore Children's Services reports documenting dad's sexual assault on Eddie at the age of three, noting cigarette burns at the age of two. You think it would be in mitigation if some of these facts had come out like that he was disrespectful, impulsive, manipulated, and so violent that they wouldn't take him into certain foster places? Actually, that would make perfect sense. It would what? If you have that, it would make perfect sense. If you understand the issues of bipolar, you understand the issues of childhood trauma, you understand the issues of physical assault and sexual assault on a child, that's why you have an expert. He doesn't simply come in and say, oh, yes, he had a bad childhood. Or he had a good childhood. But you explain what those life events do to the development of a child's brain. What is it like to be 13 years old and being given lithium? And then have your mom take your lithium away because she thinks it's hurting your liver. So he goes on medicated. But your theory that the best defense is to put on the worst case for your client showing how rough and tough he was, lived in the slums, and was manipulative and so violent they couldn't control him? In some cases, yes. Or at least to have that information and decide how are we going to put on this information. But the lawyers in this case had none of this. The post-conviction record covers 400 pages of materials that counsel never saw. Those 400 pages include police reports documenting the physical abuse against mom, documenting the physical and sexual assaults on Eddie. There are children's services records that demonstrate that his child was repeatedly referred for inpatient treatment, none of which was provided. Throughout Eddie's young life, everybody failed him. His mother failed to protect him from an abusive father. She failed to protect him from a sexually predator brother. She left him alone. When he went to Delaware, she didn't look for him for four months. She was happy, as she said in her affidavit in post-conviction, for the reprieve, that she didn't have to worry about where he was or what he was doing. She didn't look for him because she didn't want him back. Contrary to the prosecutor's position and the attorney general's position, that this was strategy. These were lawyers who just didn't know what they were doing. Well, it might have been strategy because everything you do to make Mr. Lange less redeemable can have the effect on some jurors of making them less likely to think that life should be spared. You and I talked about that when we started out. You've got to figure out where the best place to draw the line is, I would think, if you're a defense lawyer. I agree, Judge. But you've got to know where that line is. You've got to know what your information is. Strickland's very clear. We will give deference, and we under 2254 will give double deference to state judgment for strategic decisions. A decision made on the absence of evidence is not a strategic decision. That's where these lawyers failed. And we know that based on the record developed in post-conviction. We know that Dr. Smaldon was supposed to create a report and was supposed to testify. And that's why at the beginning of the trial... I don't know what he said to the litigation expert or what he learned from the defense. We do not. And that's because, in this case, it demonstrates it specifically. One of the issues in the post-conviction appeal was the denial of discovery in evidentiary hearing. And the Court of Appeals in this case ruled as Ohio law requires. There is no discovery or hearings in state post-conviction. So when you have a state appellate process and a state fact-finding process that doesn't provide the defendant the opportunity to develop those facts, to answer that question, I'd love to be able to answer your question, Judge, and tell you this is what he said. But the state court process simply doesn't do that. So if Ohio law does not allow discovery or the development, as you indicate, then why shouldn't a federal district court be able to have discovery and develop the record? With leave of the court? Yes, please. They should. That's not what the comedy of federal habeas is about. So has this court ever addressed that problem? It has not. And I take it the U.S. Supreme Court has not addressed it either. Not in that type of situation. Where the state law prohibits the development of the record. Because where else can the record be developed? Nowhere. We asked in the district court, we asked for leave to depose trial counsel, to put him under oath, put him under a subpoena, and bring him in and answer those questions. So do you have some argument under 2254 as to why, because normally the federal courts are pretty much restricted in terms of the development of evidence. Correct. I would go straight to the language of 2254 itself. An adjudication on the merits. That's a term of art taken from ex parte hawk and mirrored in Stone v. Powell that recognizes a full and fair opportunity to develop and litigate your claims. Then the state gets deference. That's not what happened. Is that a violation of the Penn-Holster case? No, because Penn-Holster got that in state court. So there was a hearing in Penn-Holster. There was discovery. He wanted new evidence. He had additional evidence in habeas. And Penn-Holster itself recognizes that the Williams case remains valid, that there is an opportunity in federal habeas to develop facts not developed in state court. So the 400-page record that your opponent was referring to was all material that post-conviction counsel was able to develop on his or her own? Correct. Yes. Without the benefit of any discovery rules? And Mr. Lang was lucky. He had the state public defenders who have the resources to do some of that stuff. And they were able to collect that. But they still didn't get discovery. They asked for it. They didn't get an evidentiary hearing. They asked for it. And the Court of Appeals in this case said Ohio law does not provide for discovery in state post-conviction. It does now. The statute now provides it. But it didn't at the time. What year did the law change? If I remember correctly, it would have been 2014. It's been very recent. Well, thank you very much. Your red light is on. Thank you both for your argument. The case will be submitted. And would the clerk adjourn?